**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

CROSMAN CORPORATION,

        PLAINTIFF,

v.

HECKLER & KOCH, INC.,

        DEFENDANT.

CASE NO. 4:09-CV-63 (CDL)

**PLAINTIFF CROSMAN CORPORATION'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

## I.      INTRODUCTION

Plaintiff Crosman Corporation ("Crosman" or "Plaintiff") brings its motion for preliminary injunction pursuant to Federal Rule of Civil Procedure 65 to prevent Defendant Heckler & Koch, Inc. ("HK" or "Defendant") from continuing its unlawful interference with Crosman's existing and prospective business relations, and to preliminarily enjoin Defendant from impeding or forcing third parties – Crosman's resellers – out of the business of selling Crosman's products to the public.  Specifically, the Court should enjoin Defendant HK from causing Crosman's products to be removed from Internet sales sites by making assertions that (i) Defendant has trade dress rights in each of the product *designs* of its numerous individual firearms, and (ii) those putative trade dress rights preclude others from replicating or emulating those features in airsoft guns.  In short, HK's bullying of Crosman's customers is based on unsupported, and legally unsupportable, claims of trade dress "rights" that simply do not and cannot exist.

The Court should grant Crosman's motion to preserve the status quo and protect Crosman from the irreparable harm that is certain to result should HK be permitted to continue its baseless assertions of rights, which assertions are intended to cause, and which do cause, Crosman's products to be removed from sale on Internet sales sites.  If the Court does not grant the requested relief, Crosman's resellers and distributors likely will refuse to buy and sell Crosman's products out of fear of Defendant's meritless – but nevertheless ruthless – tactics, causing irreparable harm to Crosman's business and reputation.

## II.     BACKGROUND FACTS

### A.     Crosman and Its Products

Plaintiff Crosman is a Delaware corporation based in East Bloomfield, New York.  For more than 80 years, Crosman has manufactured, distributed, and sold airsoft guns.  (Declaration of Ken D'Arcy, ¶4, attached as Exhibit A) (hereinafter "D'Arcy Decl.").  These airsoft guns are available in a wide variety of styles and sizes, and are used for a variety of purposes, including small game hunting and large pest control for the most powerful models, to simple target practice and general recreational use for the less powerful ones. (*Id.*).  Crosman's airsoft guns include both "airsoft rifles" and "airsoft pistols" and fire spherical projectiles by releasing compressed air.  Photographs of some current Crosman airsoft rifle and pistol models are included as Attachment 1 to the D'Arcy Decl., Ex. A.

Although Crosman sells some of its airsoft guns directly to the public, Crosman primarily distributes and sells those products through distributors and other resellers.  (D'Arcy Decl. at ¶ 6).  These entities often resell Crosman's products to "brick and mortar" establishments (e.g., Wal-Mart stores) or online.  (*Id.*).  Crosman's resellers include Pyramyd Air Ltd., which operates an online store featuring a number of Crosman products, as well as products made by other

airsoft gun companies. (*Id.* at ¶ 7). Just as critical to Crosman's business, however, are its smaller resellers, such as Wholesale Hunter, which sells Crosman's products through its "store" on the popular eBay website. (*Id.* at ¶ 8).

**B.**    **HK, Its Purported Rights, and the eBay Takedown Action**

Defendant HK is the U.S. affiliate of German firearms company, Heckler & Koch GmbH. HK is the American distributor of a wide range of small arms for defense, law enforcement, and sporting use. HK's business in the United States is conducted out of its headquarters in Columbus, Georgia. (See www.hk-usa.com.) Images of some of the dozens of HK's firearms, printed from its official website, are included as Attachment 2 to the D'Arcy Decl., Ex. A. Other relevant pages from HK's official website are included as Attachment 3 to the D'Arcy Decl.

HK does not have any federal trademark registrations, or pending applications, for the trade dress (i.e., the external appearance) of any of its products or the individual external components which collectively comprise those external appearances. HK, however, has applied for such registrations in the past. Importantly, however, the United States Patent and Trademark Office ("USPTO") properly rejected each of HK's several trademark applications (the "Trade Dress Applications") for certain firearms designs on the grounds that the designs were functional and thus not protectable as trademarks. The Trade Dress Applications, as well as the relevant Office Actions of the USPTO on the Applications, are attached collectively as Exhibit B.

As set forth in more detail in Crosman's Amended Complaint, Defendant HK, through its agent Continental Enterprises, recently demanded that Pyramyd Air – a Crosman reseller – cease and desist from the distribution and sale of unspecified Crosman products. A copy of the April

30, 2009 letter from Continental Enterprises is included as <u>Attachment 4</u> to the D'Arcy Decl.,
<u>Ex. A</u>. (the "Demand Letter").

      HK stated in the Demand Letter that "it is the owner of many valuable designs,
trademarks, and trade dress," and that its "rights also include the shape and design of the actual
weapons." (*Id.*). HK, however, did not identify the specific weapons in which it claims to own
"shape and design" rights, or identify those purported appearance-related rights with any
particularity. Nor did HK identify the particular airsoft guns sold by Pyramyd Air that allegedly
infringe HK's appearance-related rights. (*Id.*). Rather, HK simply demanded that Pyramyd Air
tender a lump sum payment of $12,500.00 and provide a "full accounting" of its sales, and
attached approximately 36 images of firearms and airsoft guns, including seven Crosman airsoft
guns. (*Id.*). In this lawsuit, Crosman based its original claims for declaratory judgment (Counts I
and II) on the threatened litigation concerning Crosman's products. (Dkt. 1, Compl. ¶¶ 17, 25-
38).

      It has come to Crosman's attention lately that, on or about April 21, 2009, HK contacted
the well-known Internet auction site eBay (www.ebay.com) concerning products that were being
offered for sale on the eBay website by another Crosman product customer, reseller Wholesale
Hunter. (D'Arcy Decl. at ¶ 11). Specifically, HK represented to eBay that products being sold
by Wholesale Hunter on eBay infringed the unspecified trademark rights of HK, which
"trademark" rights include "trade dress" rights. (*Id.*). HK, however, did not provide further
information regarding what particular trade dress or trademark rights it purported to own. (*Id.*).
EBay, pursuant to its policy, under which such claims are not vetted, and solely as a result of
HK's unsupported representation, removed Wholesale Hunter's listing from the eBay site and
notified Wholesale Hunter of HK's claim of infringement. A copy of the notification e-mail

from eBay to Wholesale Hunter is included as <u>Attachment 5</u> to the D'Arcy Decl., <u>Ex. A</u>.  The eBay listings taken down by eBay at HKs urging included Wholesale Hunter's offer for sale of Crosman's "Pulse M70" model airsoft gun.  An image of Crosman's Pulse M70 model is included as part of <u>Attachment 1</u> to the D'Arcy Decl., <u>Ex. A.</u>  There is no HK "M70" rifle, and HK has no federal trademark registration for either the alphanumeric designation "M70" or the external appearance (*i.e.*, the trade dress) of Crosman's Pulse M70 airsoft gun.

Importantly, eBay's notification e-mail from eBay directed Wholesale Hunter to an eBay webpage written by HK describing HK's overly broad "enforcement" program which precipitated the listing's removal, specifically,

http://cgi3.ebay.com/ws/eBayISAPI.dll?ViewUserPage&userid=hk_enforcement (the "Overreaching HK eBay Page").  A print-out of the Overreaching HK eBay Page is included as <u>Attachment 6</u> to the D'Arcy Decl., <u>Ex. A</u>.  On the Overreaching HK eBay Page, HK represents that it owns trade dress rights in the "designs and shapes" of all HK models, and lists, as examples, 20 such models by their specific model numbers, e.g. HK45, HK69A1, HK416, etc.).  (*Id*).  Moreover, though HK states that it will "take action against all infringers that it uncovers," it refuses to tell an eBay seller affected by a takedown which of the products being sold are infringing, or why.  (*Id*. at FAQ #8).

Crosman resellers such as Wholesale Hunter, Pyramyd Air, and others are likely to be unwilling to sell Crosman products in the future unless and until HK is enjoined from making such unsupportable representations for the purpose of causing or attempting to cause eBay (or any other entity) to remove listings featuring Crosman products.  (D'Arcy Decl. at ¶ 13).

## III.    ARGUMENT AND CITATION OF AUTHORITY

### A.    STANDARD FOR GRANTING A PRELIMINARY INJUNCTION IN THE ELEVENTH CIRCUIT

To prevail on its motion for preliminary injunction, Crosman must that show that: (1) it is substantially likely to succeed on the merits of its claim; (2) it will suffer a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs the harm an injunction may cause; and (4) granting the injunction would not disserve the public interest. *N. Am. Medical Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211 (11th Cir. 2008); *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001). As discussed in detail herein, Crosman can more than satisfy its burden on each of these elements.

### B.    THE FIRST FACTOR: CROSMAN IS SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS.

Crosman's Amended Complaint consists of three counts. First are two claims for declaratory judgment, specifically for Crosman's non-infringement (Count I) and HK's lack of trade dress rights (Count II). Crosman also maintains a third claim for tortious interference with existing and prospective business relations (Count III). As explained below, although a preliminary injunction is warranted under any one of these counts, Crosman is substantially likely to prevail on the merits of all three of its claims.

#### 1.    HK Does Not Own Protectable Trade Dress Rights

The U.S. Supreme Court has held that "[i]n general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying. . . . copying is not always discouraged or disfavored by the laws which preserve our competitive economy." *Traffix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001). HK has never asserted copyrights or patent rights in this country in the external appearances of its dozens of firearms

models.  Indeed, HK's claims of infringement directed at the appearances of Crosman's products appear to concern HK's putative *trade dress* rights alone.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, provides a cause of action for trademark and trade dress infringement.[1]  It is axiomatic that one cannot enforce trademark or trade dress rights that do not exist.  *Natural Answers, Inc. v. SmithKline Beecham Corp.* 529 F.3d 1325, 1329 (11th Cir. 2008) (holding that a plaintiff cannot bring a trademark infringement claim without a valid trademark).  Indeed, before the Court need even consider whether a likelihood of confusion exists between respective trade dress designs, it must determine as a threshold matter whether the party claiming trade dress rights even owns a protectable interest in the putative trade dress as a trademark, i.e., as a source-identifier.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 209, 210 (2000;  *Gift of Learning Found., Inc. v. TGC, Inc.*, No. 01-8069, 2001 U.S. Dist. LEXIS 25301, at *29 (S.D. Fla. Oct. 29, 2001), *aff'd*, 329 F.3d 792 (11th Cir. 2003)(holding that "[t]he confusion that plaintiff claims exists is irrelevant unless the trademark is protectible in the first instance.").

To demonstrate that it has such rights, a party claiming infringement of an unregistered trade dress bears the heavy burden of proving that (1) the features of the putative trade dress are not functional and (2) the putative trade dress has acquired a distinctiveness, i.e., a "secondary

---

[1] "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which – (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."  15 U.S.C. § 1125.

LEGAL02/31384132v8

meaning" as a source identifier.[2]  *Wal-Mart,* 529 U.S. at 210; *Epic Metals Corp. v. Frank Souliere, Sr.,* 99 F.3d 1034, 1038 (11th Cir. 1996).  Crosman is likely to succeed in its action seeking a declaratory judgment that its firearms do not infringe a putative trade dress associated with HK's firearms because HK cannot satisfy its burden of proving, separately for each of the dozens of models of its firearms products in which HK claims to be entitled to trade dress status, that (1) the elements or components comprising the external appearance of that particular model are nonfunctional; (2) the external appearance of that particular model has "secondary meaning," *i.e.,* functions in the minds of the public as a source-identifier; and (3) one or more of Crosman's airsoft guns is likely to cause consumer confusion because of the non-functional and source-identifying aspects of the external appearance of HK's firearms.

> **a.    The elements comprising the external appearances of HK's several firearms are functional and, therefore, not protectable under the Lanham Act.**

The Lanham Act only protects trade dress that is primarily *non-functional*.  (*Id.*).  As the Supreme Court held in *Traffix,* it is a "well-established rule that trade dress protection may not be claimed for product features that are functional" and that patent law, not trademark law, rewards manufacturers for any innovation that results in functional features of a product.  *Traffix,* 532 U.S. at 29, 34.  In a trade dress infringement action under Section 43(a), the claimant has the burden of proving that the putative trade dress is not functional.  15 U.S.C. § 1125(a)(3).  Product designs often incorporate functional features that are not protectable, thus courts exercise particular caution when considering whether to protect product design.  *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.2d 373, 380 (2nd Cir. 1997).

---

[2] Once a claimant has demonstrated its rights in a trade dress, it must prove that the allegedly infringing trade dress is confusingly similar to claimant's trade dress.  *See Wal-Mart,* 529 U.S. at 210.  "[A]s all three elements are necessary for a finding of trade dress infringement, any one could be characterized as threshold."  *Epic Metals Corp. v. Frank Souliere, Sr.*, 99 F.3d 1034, 1039 (11th Cir. 1999).

The Supreme Court held in *Traffix* that a product feature is functional if "it is essential to the use or purpose of the device or [if] it affects the cost or quality of the device." *Traffix Devices*, 532 U.S. at 33 (concluding that a dual-spring design was functional because its purpose was to keep signs upright against the wind); *Dippin' Dots, Inc. v. Frosty Bites Distrib.*, LLC, 369 F.3d 1197, 1203 (11th Cir. 2004) (noting that although a court may inquire into whether using a design exclusively will place competitors at a non-reputation-related disadvantage in cases of aesthetic functionality, a court need not do so if it considers the design functional under either prong of the traditional two-pronged test referenced above.).

Courts have required that the party asserting the trade dress rights make more than conclusive statements that its designs are not functional. *See, e.g., Colt Defense LLC v. Bushmaster Firearms, Inc.*, No. 04-240, 2005 WL 2293909, at *13 (D. Me. Sept. 20, 2005), *aff'd* 486 F.3d 701 (1st Cir. 2007) (a copy of *Colt Defense* is attached as Exhibit C.). In *Colt Defense*, a case remarkably similar to the case at bar, Colt Defense alleged that Bushmaster Firearms (and HK) infringed its putative trade dress rights in the overall shape of its M4 carbine firearm, which included the handguard and hand grip, sights and handle, adjustable buttstock, barrel shape, and color. (*Id.* at *13). The court granted the defendant's motion for summary judgment on the trade dress infringement claim, finding that the plaintiff's conclusive statement that the trade dress was distinctive and not functional was unpersuasive. (*Id.* at *30). The defendant, on the other hand, successfully argued that the design of the plaintiff's M4 carbine firearm (alleged to have been copied by both HK and Bushmaster) was functional because, for example, the barrel delivers, directs, and spins the fired bullet; the sight allows the firearm to be aimed; the handguard provides a non-slip grip; and the adjustable buttstock allows the user to improve accuracy. (*Id.* at *13).

Similarly, HK cannot satisfy its heavy burden of demonstrating that the elements comprising the external appearances of each and every one of the dozens of its firearms models are nonfunctional.  Indeed, the external features of HK's firearms, then and now, are just as functional as they were during the litigation of the *Colt Defense* lawsuit.  Moreover, as noted above, the USPTO has denied subsequently all of HK's Trade Dress Applications, in part, because the designs of HK's firearms are functional. (See Ex. B).  Specifically, in rejecting one such HK application, the USPTO stated that "[t]he proposed mark is a configuration of a gun, and the goods are firearms.  The particular features of this proposed mark, namely, the barrel of the gun, are functional for the goods because it is the metal cylindrical part of a firearm through which the bullet travels and is a functional feature of all firearms."  (*Id*.).  Tellingly, HK did not even bother responding to the USPTO's several rejections on the ground of functionality – HK had no good faith response which it could make – and HK abandoned its Trade Dress Applications. (*Id*.).

Still further, in HK's marketing of its firearms, it gratuitously articulates and touts the functionality of its products' external features.  For example, on its website, HK makes the following claims, as well as many others:

- "[A] special grip frame with interchangeable backstrap inserts and lateral plates, **allowing the pistol to be individually adapted to any user**,"

- "A Picatinny rail molded into the front of the frame **makes mounting lights, laser aimers, or other accessories easy and convenient**,"

- "An open notch rear sight with luminous (non-radioactive) contrast points **allows for fast and accurate target acquisition, even under poor lighting conditions**."

See http://www.hk-usa.com/p30_general.asp (emphasis added) (included as part of Attachment 3 to the D'Arcy Decl., Ex. A). HK makes similar claims with regard to its rifles. For example, it claims that its SL8-6 has:

- "[E]rgonomic and clean lines [that] are **functional and modern**,"

- "Designed and engineered to **deliver exceptional shooting performance**, . . . due in large part to its modular construction and free-floating bull barrel,"

- "A short Picatinny rail mount is standard and **allows accessory optics to be easily added**,"

See http://www.hk-usa.com/sl86_general.asp. (included as part of Attachment 3 to the D'Arcy Decl., Ex. A).

In sum, HK cannot even come close to satisfying its heavy burden of proving that the features comprising the external features of each of its dozens of firearms products are nonfunctional. Those features are functional under the Supreme Court's holding in *Traffix* because the features are "essential to the use or purpose of the device" or "affect the cost or quality of the device." Thus, HK cannot support its representation to eBay and others that it has trademark/trade dress rights in the external appearance of *any*, much less *all*, of its firearms products. Accordingly, Crosman is substantially likely to succeed on the merits of each of its claims.

      **b.**    **HK cannot prove that the external appearance of every one of its firearm designs has acquired "secondary meaning" so as to be a proprietary trade dress.**

A particular product design may be protectable *only* if it is both nonfunctional and has an "acquired distinctiveness." *Wal-Mart*, 529 U.S. at 216. Such acquired distinctiveness is often

referred to as a "secondary meaning."[3] *Wal-Mart*, 529 U.S. at 211. While some trademarks and product *packaging* trade dress may be inherently distinctive (*see, e.g., Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992)), and protectable immediately upon a *bona fide* use in commerce, a putative trade dress consisting of product *design* never can be inherently distinctive. *See Wal-Mart*, 529 U.S. at 216. Instead, secondary meaning must have attached to the product design before it may be considered to be a proprietary trademark/trade dress. (*Id.*).

To prove that any particular product design has acquired the requisite secondary meaning, the claimant must demonstrate that its alleged trade dress identifies the *source* of the product, not the *product itself*, in the minds of the consuming public. *Wal-Mart,* 529 U.S. at 210-11 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11 (1982)). In other words, that trade dress itself must be not only nonfunctional, but also in essence a "brand." Proving that the putative trade dress serves as a brand so as to identify the source of the product "entails vigorous evidentiary requirements." *Colt Defense*, *LLC*, 2005 WL 2293909 at *32.

To determine whether a claimant has proved that its putative trade dress has achieved secondary meaning, the Eleventh Circuit has instructed trial courts to weigh the following four factors:

(1) the length and manner claimant has used its putative trade dress;

(2) the nature and extent of advertising and promotion;

(3) the efforts claimant has made to promote a conscious connection in the public's mind between the putative trade dress and the claimant's product or business; and

(4) the extent to which the public actually identifies the claimed features with the claimant's product or business.

---

[3] "Secondary meaning," sometimes referred to as "acquired distinctiveness," refers to the consuming public coming to consider a product's *design*, as opposed to the product itself, as a source identifier. *Wal-Mart*, 529 U.S. at 211. For example, the color pink, when used in connection with insulation, is the well-known product design trade dress of Owens Corning brand insulation. *See, e.g.*, U.S. Reg. No. 2380742 for the color PINK for insulation.

*See Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1513 (11th Cir.1984); *Gift of Learning Found., Inc.* 329 F.3d 792 at 800 (evaluating the four factor test for determining secondary meaning in the trademark context); *Hi-Tech Pharmaceuticals, Inc. v. Herbal Health Products, Inc.*, 311 F. Supp.2d 1353, 1357 (N.D. Ga. 2004), *aff'd* 132 Fed. Appx. 348 (11th Cir. 2005)(considering the four factor test in a trade dress case and finding no secondary meaning on motion for preliminary injunction).

It is highly improbable, if at all *possible*, that HK will be able to satisfy its heavy burden of demonstrating that the external appearance of each and every one of its dozens of firearms products has achieved secondary meaning, *i.e.*, serves by itself as a brand or trademark. For instance, several of the firearms in which HK claims trade dress rights are new models.  HK even admits, for example, that the P30 is "a recent HK pistol design," the P30L was "introduced in 2008," the P2000 is "the first of the many recent additions to the Heckler & Koch handgun line," and that the MR556 and MR762 will not even be sold in the United States until late 2009.  *See* www.hk-usa.com, Attachment 3 to the D'Arcy Decl., Ex. A.  Even among the older models of firearms, HK cannot prove that it has advertised and promoted those products such that the external appearance of each is tantamount to a brand.

HK's contention, on which singular basis Crosman's goods are being removed from sale on eBay, that HK owns proprietary trade dress rights in the external features of about twenty different firearms, defies reason and common sense.  Accordingly, for this additional reason, Crosman is substantially likely to succeed eventually on the merits of its claim for a declaratory judgment of HK's lack of trade dress rights in those firearms' external appearances.

LEGAL02/31384132v8

2.    **HK Also Is Not Likely To Be Able To Prove That A Likelihood of Confusion Exists Between Crosman's and HK's Respective Products**

As discussed above, HK does not own protectable trade dress rights in its product designs because (i) those design are comprised of functional features, and (ii) those designs do not serve as "brands" (i.e., source-identifiers) in the minds of the public.  Because HK has no legally cognizable rights to *protect*, it has no rights to *enforce*.  Accordingly, the Court need not even reach the question of whether HK is likely to succeed eventually in proving that Crosman's product designs are likely to cause confusion with any proprietary designs of HK.  *Wal-Mart*, 529 U.S. at 210 ("without distinctiveness the trade dress would not 'cause confusion . . . as to the origin, sponsorship, or approval of [the] goods.' ")(quoting 15 U.S.C. §1125(a)(1)(A)).  Assuming, however, that the Court determines that HK is likely to prove that it *does* have protectable trade dress rights in all of its product designs so as to warrant HK's representations to eBay and others, HK will not be able to demonstrate that any allegedly infringing design is likely to cause confusion with any product made by HK.  *See* 15 U.S.C. 1125(a)(1)(A); *Wal-Mart*, 529 U.S. at 210.

In the Eleventh Circuit, courts consider and weigh several factors in determining whether a likelihood of confusion exists between the parties' respective trade dress.  These factors include (1) the strength of the claimant's trade dress, (2) the similarity of the designs, (3) the similarity of the products, (4) the similarity of retail outlets and purchasers, (5) the similarity of advertising media used, (6) the intent of the alleged infringer, and (7) actual confusion.  *Univ. of Fla. v. KPB, Inc.*, 89 F.3d 773, 777 n.7 (11th Cir. 1996); *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1509 (11th Cir. 1985) (noting that the factors weighed in determining whether a likelihood of confusion exists are essentially the same for trademark and trade dress

- 14 -

infringement.)  "The appropriate weight to be given to each of these factors varies with the

circumstances of the case."  *Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir. 1986).

The strength of a claimant's putative trade dress relates to where it falls on the spectrum

of distinctiveness from generic to "arbitrary or fanciful."  *Vital Pharm., Inc. v. Am. Body Bldg.*

*Prod., LLC.*, 511 F. Supp.2d 1303, 1315 (S.D. Fla. 2007); *see Univ. of Fla.*, 89 F.3d at 776 (a

plaintiff cannot claim exclusive rights in a trade dress if it is not distinctive).  Any product design

is "descriptive," at best, or possibly even generic.  *Wal-Mart*, 529 U.S. at 212 (holding that

product design trade dress can never be inherently distinctive).  Thus, any putative trade dress of

HK, if any such trade dress did exist, would be relatively weak.

As to the similarities of the parties' respective designs, comparing the Crosman Pulse

M70 – the subject of the eBay takedown – with any number of HK's firearms makes it readily

clear that consumers are not likely to be confused.  In fact, it is difficult to determine what, if

any, attributes of Crosman's M70 that HK believes to be confusingly similar to any of its

firearms.  Moreover, the airsoft pellet-firing guns of Crosman are quite different from the

submachine guns and pistol weapons of HK, and the parties' products are sold typically through

different channels of trade and are "targeted" at different purchasers.  For these and other

reasons, HK would be unable to prove that the public is likely to be confused as to the source or

origin of Crosman's airsoft guns even if HK did have proprietary rights in the external

appearances of each and every one of twenty or more firearms – which rights HK does not have.

Hence, for yet another flaw in HK's assertions, Crosman is likely to succeed on the merits of its

trade dress-related claims.

LEGAL02/31384132v8

3.      **Crosman Will Prevail on Its Tortious Interference Claim.**

The facts and law discussed above make it eminently clear that HK cannot rightfully continue to assert trade dress rights in each of more than twenty separate firearms designs. Accordingly, HK has no right to prevent or impair the sale of Crosman's products, on eBay or elsewhere, via such assertions. HK's actions therefore constitute tortious interference with Crosman's business relationships.

To establish tortious interference with a business relationship, the plaintiff must show that the defendant: (1) acted improperly and without privilege; (2) acted purposely and with malice with the intent to injure; (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff; and (4) caused the plaintiff some financial injury. *Hayes v. Irwin*, 541 F. Supp. 397, 429 (N.D. Ga. 1982), *aff'd* 729 F.2d 1466 (11th Cir. 1984). "In the context of tortious interference with business, the term [malice] is to be construed liberally: The act is malicious when it is done with knowledge of the plaintiff's rights and with the intent to interfere with them." (*Id.*) (citing *Architectural Manf. Co. v. Airotec, Inc.*, 119 Ga.App. 245, 166 S.E. 744 (1969)).

HK's actions against Crosman's customers represent the precise type of tortious behavior that is proscribed by Georgia law. O.C.G.A. § 51-9-1 ("The right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie.").

As discussed above, HK has sent cease and desist letters to Crosman's customers in which it asserted trade dress rights, and threats of litigation, despite the fact that HK knows, or should know, that it does not possess such broad rights. Additionally, HK, by its false yet broad

assertions of trade dress rights, purposefully has caused eBay to take-down one or more online listings hosted by Crosman's resellers.

Providing false information about another business' products, or about one's own property rights, is an improper business practice. Without the broad trade dress rights which it claims to have, HK has no legitimate reason, or legal privilege, to contact Crosman's customers or businesses otherwise involved in selling Crosman's products, and certainly not with threats of lawsuits and eBay takedowns; such unwarranted actions impede the sales of Crosman's products and result in damages to Crosman and its resellers. *Hayes v. Irwin*, 541 F. Supp. 397, 431 (noting there is a line between healthy competition and pusillanimous business practices, a line which HK has leaped far beyond).

HK's overreaching reveals its malicious intent to injure Crosman and its relationship with its customers and other resellers of Crosman's products. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 797 F.2d 70, 75 (2nd Cir. 1986). In *Universal City Studios*, the Second Circuit affirmed Nintendo's counterclaim for tortious interference against Universal after Universal attempted to force Nintendo's licensees for its Donkey Kong video game to cease marketing Donkey Kong products or to obtain licenses from Universal despite its knowledge that it had no rights in King Kong, the basis for its copyright claims against Nintendo. (*Id.*); *see also Walters v. Clairmont Sterilized Egg Co.*, 152 N.E. 410, 410 (N.Y. 1926) (finding liability for tortious interference by the defendant that threatened the plaintiff's customers with litigation for patent infringement); *Stroud v. Smith*, 45 A. 329 (Penn. 1900) (holding that the false claims of patent infringement made by the defendant to the plaintiff's customers, even if the customers knew defendant's patent had expired, could constitute tortious interference, stating "the customers might not choose to stand lawsuits, though convinced that they could win.").

- 17 -

HK's malicious actions, based on claims of multitudinous trade dress rights that even a cursory review of controlling legal precedents makes clear do not exist, are likely to result in Crosman's customers and other resellers being unwilling or unable to sell Crosman's products. During discovery, Crosman will be able to quantify, with specificity, its specific losses. In the interim, it is sufficiently clear that there is a substantial likelihood that Crosman will prevail on its claim for tortious interference, in addition to its other trade dress-related claims.

## C.    CROSMAN WILL SUFFER A SUBSTANTIAL THREAT OF IRREPARABLE INJURY IF THE INJUNCTION IS NOT GRANTED.

As a consequence of HK's overly broad assertions of trade dress rights, Wholesale Hunter has been threatened with permanent removal from eBay if it continues to sell Crosman airsoft guns. Already, that customer has been forced to cease selling Crosman's products on its online eBay store. Because of HK's unscrupulous and legally unsupportable actions, others are also likely to be unable or unwilling to continue selling Crosman's products. Moreover, if Crosman's resellers "switch brands" as a consequence of the curtailment of sale on eBay, it will be difficult if not impossible for Crosman to maintain or regain its status in the market, a status at the top that was earned through over 90 years of hard work and dedication to quality and craftsmanship. HK's legally unsupportable "reign of terror" presently puts a cloud over Crosman's business that significantly affects, or threatens to affect, its distribution chain. Due to HK's interference with Crosman's customers, particularly HK's unsupported and overreaching claims of trade dress infringement to eBay, for which Crosman otherwise has no immediate legal remedy, Crosman will continue to accumulate financial and irreparable reputational harm as a result of HK's ongoing tortious inference with its customers. The Court should find that Crosman has shown that it will suffer irreparable harm if this injunction is not granted.

**D. CROSMAN'S THREATENED INJURY OUTWEIGHS ANY POTENTIAL HARM THAT THE INJUNCTION MAY CAUSE HK.**

No harm will result to HK if the injunction issues. HK is not selling competitive airsoft guns. HK will still be entitled to its "day in court," but if an injunction is provided by the Court, during the pendency of this litigation Crosman will be able to continue its business without fear of losing its resellers as customers and without losing sales of products. Indeed, the potential injury to Crosman is truly irreparable, as explained above. With each eBay listing, with each sale that HK wrongfully impedes, and with each threatening letter demanding immediate payment that HK sends, Crosman's reputation and ability to sell its products is harmed. Without an injunction preventing HK's baseless assertion of rights to eBay and elsewhere, Crosman's entire business is at risk. By contrast, HK – which cannot in fact demonstrate that any consumer has been, or ever could be, confused – suffers nothing. Accordingly, the Court should determine that Crosman has amply demonstrated that Crosman's threatened injury vastly outweighs any potential harm that an injunction would cause HK.

**E. GRANTING THE INJUNCTION WOULD BENEFIT THE PUBLIC**

The final factor for the Court to consider on a motion for preliminary injunction is whether an injunction would disserve the public. In this case, not only would an injunction against HK's baseless enforcement campaign against Crosman's customers and resellers not disserve the public, it would most assuredly be in the public interest. Indeed, strong-arm tactics and threats, like those employed by HK, undermine the free-market system and, in the end, result in fewer choices and lower quality goods. The public, along with other members of the airsoft gun and firearms industries in this country, would also be well served by an injunction that

recognizes that baseless assertions of rights which force companies, like Crosman, into litigation, increase costs and undermine consumer confidence in the legal process.

HK does not have the trade dress rights it claims. And there is no risk of consumer confusion between the parties' respective products. The public, therefore, would not be in the least disserved by the granting of a preliminary injunction. The public, in stark contrast, would directly *benefit* from this equitable relief. The Court should find that Crosman has met its burden on this final element for the grant of a preliminary injunction.

## IV.    CONCLUSION

HK would have the Court and the public believe that it owns proprietary trade dress rights in the external features of each and every one of its dozens of submachine guns, pistols and other firearms products. Yet the Supreme Court has made clear the incredibly high standards for proving the existence of proprietary trade dress rights in even a single product design. Given the near-impossible burden HK must face, Crosman is substantially likely to prevail on its trade dress-related claims for declaratory judgment, as well as on its claim for tortious interference.

Crosman respectfully submits that the Court should grant Crosman's request for a preliminary injunction and enter an order in the form attached hereto as Exhibit D.

LEGAL02/31384132v8

Respectfully submitted,

/s/ Jason D. Rosenberg_____

LARRY C. JONES (admitted *pro hac vice*)
JASON M. SNEED (admitted *pro hac vice*)
Attorneys for Plaintiff Crosman Corporation
ALSTON & BIRD LLP
Bank of America Plaza
101 South Tryon Street, Suite 4000
Charlotte, NC 28280-4000
Telephone: 704-444-1000
Fax:  704-444-1111
E-mail:  Larry.Jones@alston.com
         Jason.Sneed@alston.com

JASON D. ROSENBERG
Georgia Bar Number 510855
Attorney for Plaintiff Crosman Corporation
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Fax:  (404) 881-7777
E-mail: jason.rosenberg@alston.com

- 21 -

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

CROSMAN CORPORATION,

       PLAINTIFF,

v.

HECKLER & KOCH, INC.,

       DEFENDANT.

CASE NO. 4:09-CV-63 (CDL)

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2009, I filed the foregoing *Plaintiff Crosman Corporation's Memorandum of Law in Support of Its Motion for Preliminary Injunction* with the Clerk of the Court using the CM/ECF system which will automatically send an electronic copy to all attorneys of record, and have served the foregoing by ***hand delivery*** to:

    John M. Bowler
    TROUTMAN SANDERS
    Bank of America Plaza
    600 Peachtree Street, NE
    Suite 5200
    Atlanta, Georgia 30308
    Tel. (404) 885-3190
    Fax: (404) 962-6513
    E-mail: john.bowler@troutmansanders.com
    *Attorneys for Defendant Heckler & Koch, Inc.*

      /s/ Jason D. Rosenberg_____
      Jason D. Rosenberg, Esq.
      Georgia Bar No. 510855